IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ERIE DIVISION

GLAVIN IVY,

Plaintiff

vs.

WELLPATH, et al.,

Defendants

)
)
)
)
)
)
)
)
)
)
)
)
)
)

1:21-CV-0061-RAL

RICHARD A. LANZILLO
Chief United States Magistrate Judge

MEMORANDUM OPINION ON
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

ECF NO. 60

I.      Introduction

Plaintiff Glavin Ivy, an inmate in the custody of the Pennsylvania Department of

Corrections (DOC) at its State Correctional Institution at Forest (SCI-Forest), brings this *pro se*

action pursuant to 42 U.S.C. § 1983 to recover damages for alleged violations of his civil rights.

In his Complaint, Ivy alleges that three medical professionals employed by Defendant Wellpath,

the private healthcare company contracted by the DOC to provide medical services to inmates at

SCI-Forest, failed to provide adequate treatment for his serious medical needs in violation of the

Eighth Amendment to the United States Constitution.  ECF No. 7.  He identifies the individual

Defendants as Dr. Robert Maxa, an on-call physician at SCI-Forest, and nurse practitioners

Andrew Leslie and William Sutherland.  *Id.*  In addition to his Eighth Amendment claims, Ivy

asserts a medical malpractice claim against all Defendants, a retaliation claim against Dr. Maxa,

and a *Monell* claim against Wellpath.

1

Following the close of discovery, Defendants filed a motion for summary judgment, supporting brief, concise statement of material facts, and appendix of exhibits. ECF Nos. 60-62. Plaintiff responded by filing a brief in opposition, responsive concise statement of material facts, and numerous exhibits, including his own sworn declaration. ECF Nos. 65-67. For the reasons explained below, Defendants' Motion will be GRANTED.[1]

II.     Factual Background

The following facts are derived from the parties' respective concise statements of material fact to the extent they are supported by the record and the exhibits submitted by the parties, including Ivy's medical records. On January 4, 2018, while incarcerated at SCI-Forest, Defendant Leslie examined Ivy for complaints of constipation, hard stool, diarrhea, and nearly constant abdominal pain that worsened after eating. ECF No. 62 ¶ 8; ECF No. 67 ¶ 8. Leslie examined Ivy's abdomen and determined that it was flat, tender to the touch in the upper quadrants, and had normal bowel sounds in all four quadrants. *Id.* He assessed Ivy with constipation, ordered a bottle of Mag Citrate as treatment, and instructed Ivy to return as needed. *Id.* Although Leslie's notes indicate that Ivy refused the Mag Citrate for "financial reasons," Ivy states that he declined because he had previously had "experienced adverse effects" from that medication. *Id. See also* ECF No. 66 ¶ 3.

On March 14, 2018, a non-Defendant nurse assessed Ivy in triage for ongoing complaints of abdominal pain. ECF No. 62 ¶ 9; ECF No. 67 ¶ 9. Ivy reported that he was nauseous (but not vomiting) and that his stool color had changed. *Id.* The nurse noted that Ivy had been examined for the same issue two months prior. *Id.* Upon examination, the nurse determined that Ivy's

---

[1] The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge to conduct all proceedings in this case, including the entry of final judgment, as authorized by 28 U.S.C. § 636.

abdomen was soft, round, tender to palpation in the right and left upper quadrants, and that he

had active bowel sounds. *Id.* The nurse ordered an X-ray and lab work and instructed Ivy to

follow up with Leslie. *Id.*

Leslie visited Ivy later that same day at the request of the nursing department. ECF No.

62 ¶ 10; ECF No. 67 ¶ 10. He noted continued complaints of abdominal pain, change in stool

color, and increased pain after eating. *Id.* Upon examination, Leslie determined that Ivy was

negative for Murphy's sign (a test for acute cholecystitis), had pain with percussion in his upper

and lower right quadrants, and was not feverish. *Id.* Leslie ordered an abdominal X-ray and

several blood tests. *Id.*

On March 15, 2018, Ivy underwent a kidney-ureter-bowel X-ray. ECF No. 62 ¶ 11; ECF

No. 67 ¶ 11. His X-ray showed a nonspecific bowel gas pattern with abundant stool in his colon

and gas in his rectum but no small bowel obstruction or free air. *Id.* Leslie provided Ivy with a

solution of Magnesium Citrate that caused him to involuntarily vomit while walking back to his

cell. ECF No. 66 ¶ 4.

On March 19, 2018, Leslie again examined Ivy for his complaints of abdominal pain.

ECF No. 62 ¶ 12; ECF No. 67 ¶ 12. Leslie determined that Ivy's abdomen was flat, much softer

than during the previous examination, positive for bowel sounds, and dull to percussion. *Id.* He

prescribed Ivy four capsules of Bentyl to take as needed and discussed other interventions such

as Fibercon and Bacid. *Id.* Although Leslie's notes indicate that Ivy reported positive results

from Mag Citrate and Biscodyl, Ivy maintains that the Mag Citrate caused him to involuntarily

vomit. *Id. See also* ECF No. 66 ¶¶ 4-5.

Ivy visited Leslie for another follow-up on March 22, 2018. ECF No. 62 ¶ 13; ECF No.

67 ¶ 13. At that time, Ivy reported that Bentyl greatly reduced his symptoms. *Id.* Leslie noted

that Ivy's abdomen appeared flat and was not affected by touch.  *Id.*  He assessed abdominal pain

and constipation and ordered a thirty-day prescription of Prilosec 40 mg, Fibercon, Basid, and

Bentyl 10 mg.  *Id.*  Leslie told Ivy to return for a recheck in one week.  *Id.*

On March 29, 2018, Ivy reported that his abdominal pain was unbearable at times and

that he had been modifying his diet.  ECF No. 62 ¶ 14; ECF No. 67 ¶ 14.  He indicated that

Bacid and Fibercon increased his bowel noises and feelings but did not produce any bowel

movement.  *Id.*  Upon examination, Leslie reported that Ivy's abdomen was firm but painful to

mid to light touch.  *Id.*  He assessed Ivy with constipation and abdominal pain and ordered

prescriptions for Levsin SL and MiraLAX.  *Id.*

On April 4, 2018, Leslie again examined Ivy for complaints of abdominal pain.  ECF No.

62 ¶ 15; ECF No. 67 ¶ 15.  Ivy reported improved but intermittent pain and indicated that he had

stopped consuming bread after reading about celiac disease.  *Id.*  Leslie determined that Ivy was

not in acute distress and made a note to "consider celiac disease."  *Id.*  After reviewing Ivy's

symptomology, course of treatments, and physical examination, Leslie placed an order for Ivy to

be tested for celiac disease via Vitamin B12, folate, CBC, and gliadin antibody lab testing.  *Id.*

Ivy's lab report came back on April 12, 2018.  ECF No. 62 ¶ 16; ECF No. 67 ¶ 16.  Ivy's

Vitamin B12 and folate levels were normal, and he was negative for H. pylori.  *Id.*  After

reviewing Ivy's labs, Dr. Maxa noted that his results were "not clinically significant" with

respect to any of the celiac disease indicators (CBC, Vitamin B12/folate, H. pylori, and celiac

disease panel).  *Id.*  Ivy notes, however, that his hemoglobin, hematocrit, MCV, and MCH levels

were below the reference range, suggesting the possibility of iron deficiency anemia.  *See* ECF

No. 67 ¶ 16; ECF No. 61-1 at p. 72.

On April 30, 2018, Ivy visited a nurse for complaints of dull, crampy, intermittent abdominal pain and nausea. ECF No. 62 ¶ 17; ECF No. 67 ¶ 17. After noting that Ivy had a history of constipation, the nurse examined his abdomen and noted that he had bowel sounds, his abdomen was soft and non-tender, and his abdomen pain increased with walking. *Id.* Based on the exam, the nurse determined that no referral was necessary and advised Ivy to return to medical if his condition worsened or did not improve. *Id.*

On May 1, 2018, Sutherland examined Ivy for complaints of left upper quadrant pain, constipation, intermittent liquid stools, worsening pain during the night, and use of hyoscyamine[2] two to three per day. ECF No. 62 ¶ 18; ECF No. 67 ¶ 18. Upon examination, Sutherland found that Ivy's abdomen was soft and supple with normoactive bowel sounds and pain to the touch. *Id.* Sutherland noted that Ivy tested negative for H Pylori IGG and had normal vitamin B12 levels. *Id.* He ordered an X-ray of Ivy's abdomen and blood work and instructed Ivy to maintain his current treatment regimen. *Id.*

On May 3, 2018, Ivy reported to Leslie that he had not experienced any relief of his symptoms. ECF No. 62 ¶ 19; ECF No. 67 ¶ 19. Ivy stated that he was still experiencing erratic bowel movements and pain diffuse to the abdomen, particularly when walking. *Id.* He indicated that Motrin helped "some" but that Levsin, Bentyl, Fibercon, Miralax, Bacid, and Omeprazole did not provide relief. *Id.* Ivy denied fever, chills, vomiting, or diarrhea. *Id.* Upon examination, his abdomen remained flat with diffuse tenderness to touch, especially on the right side, and bowel sounds. *Id.* The plan was to wait for the X-ray report. *Id.* Leslie noted that, per his CBC, Ivy had hypochromic normocytic anemia, a term used to describe any type of anemia

---

[2] Levin SL, or hyoscyamine, is an anti-tremor and gut antispasmodic. ECF No. 62 ¶ 14 n. 4.

in which red blood cells are paler than normal. *Id.* Sutherland ordered three fecal occult blood tests[3] for Ivy to self-administer and indicated that he would "consider colonoscopy." *Id.*

On May 3, 2018, Mr. Ivy underwent a kidney, ureter, and bladder (KUB) X-ray. ECF No. 62 ¶ 20; ECF No. 67 ¶ 20. The impression revealed nonspecific bowel gas pattern with an abundant amount of colon stool but no small bowel obstruction or free air. *Id.*

On May 9, 2018, Ivy had an episode in the food hall after eating. ECF No. 66 ¶ 10. Ivy could not stand and was barely able to walk to medical, almost fainting several times. *Id.* Once he arrived at medical, Ivy was unable to sign a cash slip authorizing the deduction of his $5.00 medical copay because he was in "acute distress." *Id.* ¶ 11. Because he could not sign, Ivy was refused treatment by Leslie and a non-Defendant. *Id. See also id.* at ¶ 12.

On May 10, 2018, Mr. Ivy tested negative for the Epstein-Barr Virus (EBV). ECF No. 62 ¶ 21; ECF No. 67 ¶ 21. Sutherland also performed a Westergren sedation rate (ESR) test[4] with normal results. *Id.*

On May 15, 2018, Ivy submitted three hemoccult tests. ECF No. 62 ¶ 22; ECF No. 67 ¶ 22. The first, taken on May 10, 2018, was negative. *Id.* The latter two, taken on May 14 and May 15, 2018, were each positive. *Id.*

Ivy met with Leslie on May 18, 2018, to discuss his positive fecal occult blood test results. ECF No. 62 ¶ 24; ECF No. 67 ¶ 24. Leslie assessed Ivy with chronic constipation and planned to order a colonoscopy. *Id.* Ivy indicated that he agreed with the plan. *Id.*

---

[3] A fecal occult blood test is a lab test used to check stool samples for hidden (occult) blood. Occult blood in the stool may indicate colon cancer or polyps in the colon or rectum. *See* https://www.mayoclinic.org/tests-procedures/fecal-occult-blood-test/about/pac-20394112 (last visited June 23, 2023).

[4] An ESR is a blood test that can reveal inflammatory activity in the body. It is used to help diagnose or monitor the progress of an inflammatory disease. *See* https://www.mayoclinic.org/tests-procedures/sed-rate/about/pac-20384797 (last visited June 23, 2023).

Ivy returned to Leslie on May 25, 2018, for a sick call visit. ECF No. 62 ¶ 26; ECF No.

67 ¶ 26. Ivy stated he was requiring more and more ibuprofen. *Id.* Ivy's progress notes indicate

that he received a chaperoned rectal exam that revealed a smooth, symmetrical prostate with no

external or internal hemorrhoids identified. *Id.* Leslie informed Mr. Ivy that he had been

approved for a colonoscopy consult and replaced his Motrin prescription with one for Naproxen

on a trial basis. *Id.* Leslie also noted that Ivy would be referred to the Gastroenterology Clinic at

Somerset Hospital. ECF No. 62 ¶ 27; ECF No. 67 ¶ 27.

On June 11, 2018, Ivy visited Leslie for a colonoscopy pre-op history and physical. ECF

No. 62 ¶ 29; ECF No. 67 ¶ 29. Pre-op testing included labs, an EKG, and a chest X-ray. *Id.*

Leslie also instructed Ivy to hold his Naproxen from June 22 to July 14. *Id.* Results from Ivy's

chest X-ray revealed nothing remarkable. ECF No. 62 ¶ 30, ECF No. 67 ¶ 30.

Ivy was temporarily transferred to SCI Somerset on June 28, 2018. ECF No. 62 ¶ 31;

ECF No. 67 ¶ 31. Ivy's notes indicate that his "abdominal pain with constipation" needed to be

resolved and that he had a pending colonoscopy consult at Somerset Hospital on July 3. *Id.*

Ivy's colonoscopy, performed on July 3, 2018, revealed that he had small internal

hemorrhoids. ECF No. 62 ¶ 33; ECF No. 67 ¶ 33. The physician at SCI-Somerset cleared Ivy to

leave the infirmary and return to his home institution. *Id.* He was transferred back to SCI Forest

on July 6. *Id.* Upon his return, Leslie reviewed the surgeon's report, scheduled a follow-up for

one week later, and prescribed Bentyl for Ivy's abdominal cramping. *Id.* On July 9, Dr. Maxa

created a progress note in Mr. Ivy's medical file reflecting the same. *Id.*

On July 12, 2018, Ivy failed to appear for a sick call visit to discuss his colonoscopy with

Leslie. ECF No. 62 ¶ 34; ECF No. 67 ¶ 34. Two days letter, Leslie met with Ivy and advised

him that the colonoscopy had identified internal hemorrhoids. ECF No. 62 ¶ 35; ECF No. 67 ¶

35. Leslie prescribed Bentyl and Naproxen. *Id.* According to Ivy, Leslie then told him that "he just didn't know what [Ivy's] medical issue was and that there was nothing further the medical department could do." ECF No. 66 ¶ 15. Leslie also allegedly told Ivy to "just wait it out." *Id.*

On August 16, 2018, Ivy reported to Leslie during a sick call that he was running out of Naproxen. ECF No. 62 ¶ 36; ECF No. 67 ¶ 36. Leslie examined Ivy and then renewed his Naproxen and Bentyl prescriptions. *Id.*

On January 26, 2020, Mr. Ivy was transferred from SCI Forest to the Mercer County Jail. ECF No. 62 ¶ 46; ECF No. 67 ¶ 46. Ivy's transfer form identified unspecified abdominal pain/colic as his only chronic/acute health problem. *Id.* Upon arrival, a nurse practitioner at the Chronic Care Clinic, Diana Hardy, examined Ivy and noted that he did not appear to be in any distress. ECF No. 61-1 at p. 323. Hardy suggested a fourteen-day physical due to Ivy's multiple gastrointestinal (GI) complaints and reported history of GI complaints and abdominal pain. ECF No. 62 ¶ 46; ECF No. 67 ¶ 46. She also started him on Omeprazole and ordered a full abdomen ultrasound and an anemia lab panel. *Id.*

On February 6, 2020, Mr. Ivy underwent a complete abdominal sonogram. ECF No. 62 ¶ 48; ECF No. 67 ¶ 48. The results indicated no abnormalities in his liver and kidneys and no gallstones, gallbladder wall thickening, biliary dilatation, ascites, hydronephrosis or renal calculus. ECF No. 61-1 at 325. It also noted that his pancreas and aorta were obscured by bowel gas and that his spleen was enlarged. *Id.*

On February 19, 2020, Hardy again assessed Ivy for multiple GI complaints, a history of constipation, and abdominal pain. ECF No. 62 ¶ 50; ECF No. 67 ¶ 50. During the visit, Hardy reviewed the results of Ivy's labs, ultrasound, colonoscopy, noting that his ultrasound and colonoscopy were negative for hemorrhoids. *Id.* Hardy encouraged Ivy to start a food diary to

determine if certain foods upset his stomach more than others and comply with his Omeprazole. *Id.* Ivy confirmed he understood everything discussed during the visit. *Id.*

On March 5, 2020, Ivy visited with Dr. Susan Rossino at the Mercer County Jail for his ongoing complaints of abdominal pain, an enlarged spleen, and constipation. ECF No. 62 ¶ 51; ECF No. 67 ¶ 51. Dr. Rossino noted that Ivy had previously been evaluated at the county jail and SCI via a c-scope in 2018 and that Ivy was requesting an upper gastrointestinal series (UGI) that had not yet been performed. *Id.* She planned to have Ivy submit CBC and CMP lab tests and undergo abdominal and pelvis CT scans. *Id.* She also prescribed him a Dulcolax suppository to be taken once every other night, discontinued his Prilosec on the grounds that it was ineffective, and directed him to return to her following his CT scan. *Id.*

Ivy underwent an abdominal and pelvic CT scan without contrast on March 16, 2020. ECF No. 62 ¶ 52; ECF No. 67 ¶ 52. That scan revealed "[w]all thickening of the distal and terminal ileum without surrounding inflammatory stranding or induration" and "no bowel distension." ECF No. 61-1 at p. 317. Per the interpreting radiologist, diagnostic considerations included an ileitis of either infectious or inflammatory etiologies. *Id.*

Ivy returned to SCI Forest on March 23, 2020. ECF No. 62 ¶ 53; ECF No. 67 ¶ 53. He visited Leslie for a sick call on April 5, 2020, at which he requested the results of an MRI that had been performed at the Mercer County Jail. ECF No. 62 ¶ 59; ECF No. 67 ¶ 59. Leslie indicated that he would attempt to get those records. *Id.*

On April 15, 2020, a nurse at SCI-Forest entered a note into Ivy's medical records indicating that Ivy had been assessed at his cell in response to a sick call for his chronic abdominal pain and nausea. ECF No. 61-1 at p. 146. The nurse noted that Ivy declined oral medications such as Magnesium Citrate or Bisacodyl tablets, stating that he was only supposed

to have suppositories. *Id.* The nurse instructed Ivy that he would need to schedule a sick call visit with a nurse practitioner to request suppositories. *Id.*

Ivy visited Sutherland the following day to request suppositories, explaining that oral agents did not work and caused him to vomit. ECF No. 62 ¶ 61; ECF No. 67 ¶ 61. Sutherland prescribed a Bisacodyl suppository and indicated that he would follow-up as needed. *Id.*

On April 22, 2020, Sutherland followed up with Ivy for his complaints of ongoing abdominal pain and constipation. ECF No. 62 ¶ 62; ECF No. 67 ¶ 62. Ivy informed Sutherland of his recent ultrasound at the county jail and an MRI at UPMC Farrell and explained that the only thing that worked for him was the suppositories. *Id.* Sutherland assessed Ivy for unspecified abdominal pain/colic and indicated that he would renew Bisacodyl 10 mg, attempt to obtain Ivy's medical records from the Mercer County Jail and his MRI results from UPMC Farrell, and recheck his condition on an as needed basis. *Id.* Sutherland also ordered comprehensive and iron panels and CBC, CRP, and Prothrombin Time clinical tests to assist in determining if Ivy had Crohn's disease. ECF No. 62 ¶ 63; ECF No. 67 ¶ 63.

That same day, Sutherland received Ivy's CT scan results from UPMC and noted that the scan showed ileitis.[5] ECF No. 62 ¶ 64; ECF No. 67 ¶ 64. Sutherland ordered Budesonide 3 mg and indicated that he would evaluate Ivy's response to the medication in approximately one month. *Id.* He also noted that he would consider changing Ivy's prescription to Asacol if he improved on the Budesonide. *Id.*

On May 22, 2020, Ivy was seen by Leslie at a cell side visit. ECF No. 62 ¶ 66; ECF No. 67 ¶ 66. Ivy reported that his Budesonide prescription worked well and that he was able to have normal bowel movements. *Id.* Leslie assessed Ivy for irritable bowel syndrome, noting that he

---

[5] Ileitis is chronic inflammation of one or more sections of the intestine.

did not appear to be in acute distress. *Id.* Leslie advised Ivy that he was going to start his Asacol prescription after he completed his budesonide prescription and directed Ivy to return to nursing for further care. *Id.*

On November 5, 2020, Ivy failed to show up for a sick call visit with Leslie in response to his request for Ensure. ECF No. 62 ¶ 75; ECF No. 67 ¶ 75. During a subsequent visit with Sutherland on November 10, 2020, Ivy explained that Ensure had been provided to him at the county jail and that it helped him with his Crohn's and regular bowel movement. *Id.* Sutherland consulted with Dr. Maxa and determined that Ensure was not medically necessary. *Id.* Instead, Sutherland prescribed Mesalamine DR 800 mg. *Id.* Ivy objected that he needed Budesonide and that if he could not receive it, he would sue. *Id. See also* ECF No. 66 ¶ 22. According to Ivy, Sutherland then told him to "get the fuck out of my office" and stated: "You just threatened to sue me, you're not getting any treatment." ECF No. 66 ¶ 22. Sutherland's medical notes reflect only the visit was terminated when Ivy threatened to sue him for not giving him the medication that he wanted. ECF No. 61-1 at 100.

On November 13, 2020, Ivy visited nurse Kathleen Hill for his complaints of renewed abdominal stress. ECF No. 62 ¶ 79; ECF No. 67 ¶ 79. Hill noted that Ivy had a history of irritable bowel syndrome but that he had refused to take the most recent medication prescribed by Sutherland. *Id.* Upon examination of his abdomen, Ivy's abdomen was soft, non-tender, and had bowel sounds with no evidence of Hematuria. *Id.* Hill also noted that Mr. Ivy had been observed walking to the yard earlier that day without any issue. *Id.* Ivy renewed his demand for Budesonide and Ensure and again threatened to sue. *Id.* Hill advised him to take his ordered medication and scheduled him for a next day sick call visit. *Id.*

The following day, Ivy visited Sutherland and reported that his abdominal pain had been ongoing since his arrival. ECF No. 62 ¶ 81; ECF No. 67 ¶ 81. Sutherland assessed him with irritable bowel syndrome and unspecified abdominal pain/colic, advised Ivy to pick up peg powder[6] at 11 A.M. on the pill line, and prescribed him Budesonide 3MG, Hyoscyamine ER 0.37MG, and Prednisone 50MG. *Id.*

Ivy commenced the instant lawsuit on January 25, 2021.

III.    Standard of Review

Federal Rule of Civil Procedure 56(a) requires the court to enter summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under this standard "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Anderson*, 477 U.S. at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether a genuine issue of material fact remains for trial, the court must view the record and all reasonable inferences to be drawn therefrom in favor of the nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*,

---

[6] Peg powder is a laxative used to treat occasional constipation.

963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir. 1988). To avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. Instead, once the movant satisfies its burden of identifying evidence that demonstrates the absence of a genuine issue of material fact, the nonmoving party must go beyond his pleadings with affidavits, depositions, answers to interrogatories or other record evidence to demonstrate specific material facts that give rise to a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

Further, under Rule 56, a defendant may seek summary judgment by pointing to the absence of a genuine fact issue on one or more essential claim elements. The Rule mandates summary judgment if the plaintiff then fails to make a sufficient showing on each of those elements. When Rule 56 shifts the burden of production to the nonmoving party, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. *See Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).

IV.   Analysis

1.   Statute of limitations

Defendants first contend, albeit in a footnote, that many of Ivy's allegations are barred by the two-year statute of limitations applicable to civil rights actions in Pennsylvania. *See Kach v. Hose*, 589 F.3d 626, 634 (3d Cir. 2009) (citing *Wallace v. Kato*, 549 U.S. 384, 387 (2007)); 42 Pa. Cons. Stat. § 5524(2). Because Ivy's complaint was not filed until January 25, 2021, Defendants' argument, if correct, would bar Ivy from seeking relief for any activity that occurred prior to January 25, 2019. Invoking the discovery rule, Ivy responds that he is not a medical

professional and was thus unaware of his potential claim until diagnostic testing in 2020 revealed the source and scope of his injury. *See* ECF No. 65 at 9.

The "discovery rule" tolls the statute of limitations "whenever the plaintiff, despite the exercise of reasonable diligence, is unable to know of the existence of the injury and its cause." *Bohus v. Beloff*, 950 F.2d 919, 926 (3d Cir. 1991). The "polestar" of the discovery rule is not the plaintiff's actual knowledge, but rather "whether the knowledge was known, or through the exercise of diligence, knowable to [the] plaintiff." *O'Brien v. Eli Lilly & Co*., 668 F.2d 704, 711 (3d Cir.1981). Thus, the statute of limitations begins to run as soon as "the plaintiff knows, or reasonably should know, (1) that he has been injured, and (2) that his injury has been caused by another party's conduct." *Bohus*, 950 F.2d at 926. This is true even when "the full extent of the injury is not [yet] known or predictable." *Plummer v. Wellpath*, 2023 WL 2873883, at \*11 (W.D. Pa. Jan. 3, 2023). *See also Dorsey v. Pennsylvania Dep't of Corr*., 715 Fed. Appx. 172, 173 (3d Cir. 2017) ("The cause of action accrues when the plaintiff knows or has reason to know of the injury forming the cause of action, *Sameric Corp. of Delaware v. Philadelphia*, 142 F.3d 582, 599 (3d Cir. 1998), not at a later date, when the plaintiff learns of the full extent of her injuries.") (additional citing source omitted). Where the plaintiff "knows the fact of her injury but delays, the discovery rule does not toll the limitations period." *Dorsey v. Pennsylvania Dept. of Corr*., 2016 WL 7638509, at \*7 (M.D. Pa. Nov. 30, 2016) (plaintiff need not have known the precise medical cause of her injury to commence the running of the statute of limitations; rather, "[s]he need only to have known was that she was injured.") (citing sources omitted).

Here, Ivy's own allegations bely his reliance on the discovery rule. In his sworn declaration, Ivy admits that, "[d]uring each visit in 2018, [he] attempted to communicate the emergent nature of [his] condition" and explained "that he did not merely have constipation, [he]

needed to go to the hospital [and] to see a doctor" because "[he] believed his condition was life-threatening." ECF No. 66 ¶ 8. During that same time frame, he "repeatedly requested that Defendant Leslie schedule . . . an upper (GI) series," *id.* at ¶ 16, and "repeatedly reported to Defendant Leslie that the pain felt like someone was stretching [his] stomach and searing it with a hot poker and that this feeling was mixed with an extreme feeling of starvation." *Id.* ¶ 17. He also "reported to Defendant Leslie, during most of the visits in 2018, that [he] would awake from sleep at night, and lay there for several hours experiencing excruciating pain from abdominal attacks." *Id.* ¶ 19. Finally, he communicated to Leslie "repeatedly" throughout 2018 that the pain relievers he was being prescribed were ineffective. *Id.* ¶ 20. Each of these averments conclusively establishes that Ivy was aware, no later than 2018, that he was injured and that he believed Leslie and the medical staff at SCI Forest were providing inadequate treatment for his injury. *See Dorsey*, 715 Fed. Appx. at 173-74 ("The District Court appropriately held that Appellant's time to file ran "from the time [Appellant] reasonably should have known that [Appellees] were deliberately indifferent to her serious medical need, and not from the time the full extent of the precise medical cause of the injury was known."). Consequently, any claim based on alleged misconduct that occurred prior to January 25, 2019, is untimely and must be dismissed.[7]

---

[7] The statute of limitations is also tolled while the prisoner exhausts his available administrative remedies as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a). *Pearson v. Sec'y Dep't of Corr.*, 775 F.3d 598, 602 (3d Cir. 2015). However, Ivy has not raised such tolling in his opposition to Defendants' motion for summary judgment. *See* ECF No. 65, pp. 2-3. Nor has Ivy made a record to support such tolling. *See* ECF No. 65-1-ECF No. 65-17. In any event, such tolling would not change the ultimate disposition of Ivy's claim. *See* footnote n. 8, *infra*.

2. Deliberate indifference to serious medical needs

The heart of Ivy's lawsuit is that Leslie, Sutherland, and Dr. Maxa violated the Eighth Amendment's prohibition against cruel and unusual punishment by displaying deliberate indifference to his serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97 (1976) (stating that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment") (internal quotation omitted). To establish a violation of his constitutional right to adequate medical care, a plaintiff is required to allege facts that demonstrate: (1) a serious medical need, and (2) acts or omissions by prison officials that indicate deliberate indifference to that need. *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). Such indifference is manifested by an intentional refusal to provide care, delayed medical treatment for non-medical reasons, denial of prescribed medical treatment, a denial of reasonable requests for treatment that results in suffering or risk of injury, *Durmer v. O'Carroll*, 991 F.2d 64, 68 (3d Cir. 1993), or "persistent conduct in the face of resultant pain and risk of permanent injury." *White v. Napoleon*, 897 F.2d 103, 109 (3d Cir. 1990).

Allegations of deliberate indifference must satisfy "a high threshold." *Anderson v. Bickell*, 2018 WL 5778241, at *2 (3d Cir. Nov. 2, 2018). It is well-settled that "an inmate's dissatisfaction with a course of medical treatment, standing alone, does not give rise to a viable Eighth Amendment claim." *Tillery v. Noel*, 2018 WL 3521212, at *5 (M.D. Pa. June 28, 2018) (collecting cases). Such complaints fail as constitutional claims because "the exercise by a doctor of his professional judgment is never deliberate indifference." *Gindraw v. Dendler*, 967 F. Supp. 833, 836 (E.D. Pa. 1997) (citing *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990) ("[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights.")). "Therefore, where a dispute in essence entails

nothing more than a disagreement between an inmate and doctors over alternate treatment plans, the inmate's complaint will fail as a constitutional claim under § 1983." *Tillery*, 2018 WL 3521212, at *5 (citing *Gause v. Diguglielmo*, 339 Fed. Appx. 132 (3d Cir. 2009) (characterizing a dispute over medication as the type of "disagreement over the exact contours of [plaintiff's] medical treatment" that does not violate the constitution)).

By the same token, "the mere misdiagnosis of a condition or medical need, or negligent treatment provided for a condition, is not actionable as an Eighth Amendment claim because medical malpractice standing alone is not a constitutional violation." *Tillery*, 2018 WL 3521212, at *5 (quoting Estelle, 429 U.S. at 106). "Indeed, prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." *Durmer*, 991 F.2d at 67 (citations omitted). Thus, "courts have consistently rejected Eighth Amendment claims where an inmate has received some level of medical care." *Hensley v. Collins*, 2018 WL 4233021, at *3 (W.D. Pa. Aug. 15, 2018) (quoting *Clark v. Doe*, 2000 WL 1522855, at *2 (E.D. Pa. Oct. 13, 2000)). *See also Wisniewski v. Frommer*, 751 Fed. Appx. 192 (3d Cir. 2018) (noting that "there is a critical distinction 'between cases where the complaint alleges a complete denial of medical care and those alleging inadequate medical treatment.'") (quoting *Pearson v. Prison Health Serv.*, 850 F.3d 526, 535 (3d Cir. 2017)).

Stripping away the allegations that are time-barred, the Court is left to consider whether Ivy's remaining averments are sufficient to survive summary judgment. Specifically, the Court must determine whether Ivy has adduced evidence to create a triable issue of material fact as to any alleged medical indifference that took place after January 25, 2019. The pertinent evidence consists of the following:

- ■ Leslie told Ivy that he would attempt to obtain his medical records from Mercer County Jail

- Sutherland met with Ivy and agreed to prescribe Biscacodyl suppositories

- Sutherland renewed Ivy's Biscacodyl prescription and ordered comprehensive and iron blood panels and CBC, CRP, and Prothrombin Time clinical tests to determine if Ivy had Crohn's disease

- Sutherland reviewed Ivy's CT scan results and ordered Budesonide 3 mg for ileitis

- Leslie visited Ivy and noted that his Budesonide prescription had been effective

- Sutherland and Dr. Maxa informed Ivy that Ensure was not medically necessary

- Sutherland prescribed Mesalamine DR 800 mg instead of the medication requested by Ivy, Budesonide

- Sutherland terminated a sick call after Ivy threatened to sue if he did not receive the medication he wanted

- Sutherland prescribed peg powder, Budesonide, Hyoscyamine ER .37 MG, and Prednisone 50 MG in response to Ivy's complaint of abdominal pain

None of these interactions amounts to deliberate indifference.  As a general matter, the record plainly indicates that the medical staff at SCI Forest, including the Defendants, provided Ivy with consistent medical care for his bowel condition.  On each occasion that Ivy reported abdominal pain, Defendants addressed his complaints – although not always in the manner that he preferred – by providing medication and diagnostic testing, as warranted.  There is simply nothing in the record from which a reasonable trier of fact might infer that Ivy did not receive some level of care.

Nor is there any indication that any of the individual Defendants disregarded Ivy's medical concerns.  The only allegation of any sort pertaining to Dr. Maxa is that he rejected Ivy's request for Ensure as medically unnecessary.  Although Ivy disagrees with that decision, Dr. Maxa's exercise of medical judgment is not actionable under § 1983.  *See*, *e.g.*, *Brown*, 903

F.2d at 278 ("[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights.").

Similarly, it appears that Ivy only interacted with Leslie twice during the statutory limitations period. Each of those interactions involved a simple recheck of Ivy's condition. On one occasion, Leslie promised to obtain Ivy's medical records from another institution. On the other, Leslie noted that Ivy's medication had been effective and explained that he would transition Ivy to another medication once his ileitis had subsided. Neither of these interactions violated the constitution.[8]

Finally, Ivy contends that Sutherland displayed deliberate indifference on November 10, 2020, when Sutherland terminated a sick call after Ivy threatened to sue if he did not receive Budesonide. According to Ivy, Sutherland kicked him out of his office and denied him treatment after Ivy mentioned the possibility of litigation. His medical records reflect, however, that Sutherland provided him with Budesonide only four days later, on November 14, 2020. ECF No. 66 ¶ 24.

Ivy asserts that, during his November 14 interaction with Sutherland, Sutherland mentioned that "financial interests" played a role in his treatment decisions. Courts have found plausible claims of medical indifference where prison physicians refuse to provide adequate care for non-medical reasons, such as cost-containment. *See, e.g., Robinson v. Corizon Health, Inc.*,

---

[8] Even if the Court were to consider the entirety of Ivy's allegations of medical neglect, including those that are time-barred, it would still find no constitutional violation. The record reveals that Ivy received treatment from Leslie and Sutherland on more than a dozen occasions between January 4, 2018, and August 16, 2018. During that time, Ivy received X-rays on his chest, abdomen, kidneys, urethra, and bowels and underwent testing for Murphy's sign, celiac disease, H. pylori, occult blood, and Epstein-Barr Virus. Defendants also ordered substantial lab work including CBC, Vitamin B12/folate, MCV, MCH, and anemia. Finally, Defendants ordered or performed a Wetergren sedation rate test, a chaperoned rectal examination, and a colonoscopy. In response to his symptoms, Ivy was provided Magnesium Citrate, Bentyl, Fibercon, Biscodyl, Basid, Prilosec, Levsin SL, MiraLAX, Motrin, and Naproxen. While it appears that none of these interventions succeeded in identifying Ivy's underlying illness, "the mere misdiagnosis of a condition or medical need, or negligent treatment provided for a condition, is not actionable as an Eighth Amendment claim because medical malpractice standing alone is not a constitutional violation." *Tillery*, 2018 WL 3521212, at *5 (quoting *Estelle*, 429 U.S. at 106).

2016 WL 7235314, at *7 (E.D. Pa. Dec. 13, 2016).  However, such claims arise only when a prisoner alleges that "the provision of medical care was both inadequate and motivated by improper or non-medical reasons."  *Buehl v. Wexford Healthy Sources, Inc.*, 2017 WL 914275, at *7 (M.D. Pa. Mar. 8, 2017) (emphasis added).  *See also Pearson v. Prison Health Serv.*, 850 F.3d 526, 535 (3d Cir. 2017) (noting that a deliberate indifference claim has "two very distinct subcomponents": the physician must have provided "inadequate medical care," and he must have done so "with the requisite state of mind").  The second component – the "intent of the medical provider" – becomes critical only where "the care received by an inmate was clearly inadequate." *Robinson*, 2016 WL 7235314, at *7.

As discussed above, the care Sutherland provided to Ivy was not clearly inadequate.  Ivy consistently received examinations, medication, and diagnostic testing.  When Ivy objected to receiving MiraLAX and requested Budesonide, Sutherland acquiesced to the request shortly thereafter.  Even if cost considerations factored into his decision, the record categorically reveals that Ivy received adequate medical care despite those considerations. *See*, *e.g.*, *Winslow v. Prison Health Services*, 406 Fed. Appx. 671, 674-75 (3d Cir. 2011) ("[T]he naked assertion that Defendants considered cost in treating [plaintiff's] hernia does not suffice to state a claim for deliberate indifference, as prisoners do not have a constitutional right to limitless medical care, free of the cost constraints under which law-abiding citizens receive treatment.").  No reasonable factfinder could conclude that Sutherland had acted with deliberate indifference under such circumstances.[9]

---

[9] Ivy also references an incident on April 15, 2020, during which he "attempted to explain to Defendant Sutherland that oral agents are harmful to Plaintiff" and that he required suppositories, prompting Sutherland to "storm off." ECF No. 66 ¶ 21.  The following day, Sutherland prescribed a suppository, Bisacodyl. ECF No. 62 ¶ 61.  Nothing in this exchange suggests that any form of retaliation occurred.

3. *Monell*

Ivy next asserts a *Monell* claim against Wellpath, the entity contracted to provide medical services to inmates at SCI Forest (and the employer of Leslie, Sutherland, and Dr. Maxa). In *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978), the United States Supreme Court held that a municipality could be liable under Section 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts injury that the government as an entity is responsible." *Id.* at 694. This rule extends to private corporations, like Wellpath, that provide services pursuant to a government contract. *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581 n.4, 583 (3d Cir. 2003) ("*Monell* applies to other private organizations faced with liability under § 1983.").

Critically, "the requirement of an underlying constitutional violation is implicit in the Third Circuit's *Monell* framework." *Lansberry v. Altoona Area Sch. Dist.*, 356 F. Supp. 3d 486, 497 (W.D. Pa. 2018). *See also Gayemen v. Sch. Dist. of City of Allentown*, 2016 WL 3014896, *12 (E.D. Pa. May 26, 2016) (holding that a plaintiff asserting a *Monell* claim must plead an underlying constitutional violation); *Wilson v. City of Philadelphia*, 177 F.Supp.3d 885, 913 (E.D. Pa. Apr. 8, 2016) ("To successfully plead his *Monell* claim, Wilson must establish an underlying constitutional violation.") (citing *Monell*, 436 U.S. at 658). As noted above, Ivy has failed to adduce sufficient evidence to create a triable issue of material fact as to any timely claim for deliberate indifference. This failure to establish an underlying violation is fatal to his *Monell* claim. *See Mills v. City of Harrisburg*, 350 Fed. Appx. 770, 773, n. 2 (3d Cir. 2009) ("Absent an underlying constitutional violation by an agent of the municipality, [...] the municipality itself may not be held liable under § 1983."); *3909 Realty LLC v. City of Philadelphia*, 2021 WL 2342929, at *4 (E.D. Pa. June 8, 2021) ("As the Court finds that

Plaintiffs have not plausibly alleged any underlying constitutional violation, it is not necessary to decide the *Monell* liability issue."); *Wilson*, 177 F.Supp.3d at 917 ("Wilson fails to establish an underlying constitutional violation, and the Court accordingly need not address his *Monell* claim against the City in any further detail.").

   4.  Retaliation

   Ivy next asserts a retaliation claim based on Sutherland's response to his threat to file a lawsuit. According to Ivy, when he informed Sutherland that he would be filing a lawsuit if he was not prescribed Budesonide, Sutherland yelled at Ivy to "[g]et the fuck out of [his] office" and said: "You just threatened to sue me, you're not getting any treatment." ECF No. 66 ¶ 22.

   To establish illegal retaliation for engaging in protected conduct, a plaintiff must allege that: (1) his conduct was constitutionally protected; (2) he suffered an adverse action at the hands of prison officials; and (3) his constitutionally protected conduct was a substantial or motivating factor in the decision to take the adverse action. *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016) (citing *Rauser v. Horn*, 241 F.3d 330, 333-34 (3d Cir. 2001)). An "adverse action" is one that would "deter a person of ordinary firmness" from exercising his First Amendment rights. *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000) (quoting *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000)). To be actionable, the adverse action "need not be great" but "must be more than *de minimis*." *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006). This is an objective inquiry. *See Bistrian v. Levi*, 696 F.3d 352, 376 (3d Cir. 2012).

   In the instant case, Ivy alleges that Sutherland explicitly withheld a medically necessary medication because Ivy threatened to sue him. The record, however, refutes this claim. Most tellingly, Ivy's own declaration indicates that Sutherland had already made the decision not to

prescribe Budesonide (or any other treatment aside from MiraLAX) <u>prior</u> to Ivy's threat to sue. As Ivy states:

> Defendant Sutherland informed Plaintiff that he would prescribe Plaintiff Miralax. In response, Plaintiff pleaded with Defendant Sutherland that he needed Budesonide and could not take Miralax, and lastly, that if Plaintiff could not receive the medication known to be effective (i.e. Budesonide), that Plaintiff would have to resort to suit.

ECF No. 66 ¶ 22.  Based on Ivy's description of the incident, it is apparent that Sutherland's decision was the impetus for Ivy's threat, rather than a response to it.  Although Sutherland did terminate the sick call after Ivy's threat, there was no treatment left to withhold at that point; Sutherland had already declined to prescribe Budesonide, and Ivy had refused to take MiraLAX. Based on these facts, no reasonable factfinder could conclude that Ivy's protected activity was a substantial or motivating factor behind a decision that had already been made. *See*, *e.g.*, *Wilkerson v. Samuels*, 614 Fed. Appx. 599, 601 (3d Cir. 2015) (plaintiff must demonstrate that "his constitutionally protected conduct was a motivating factor in the decision to discipline").

   5.  Medical malpractice

   Ivy's final claim alleges medical malpractice pursuant to Pennsylvania law.  The Court will decline to exercise supplemental jurisdiction over this claim.

   "Federal courts are of limited jurisdiction, and may only decide cases consistent with the authority afforded by the Constitution or statutes of the United States." *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 378 (1994).  Thus, "[w]hen the claims over which a district court has original jurisdiction are resolved before trial, the district court <u>must</u> decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Neelu Pal v. Jersey City Med. Ctr.*, 658 Fed. Appx. 68, 74 n. 6 (3d Cir. 2016) (emphasis in original) (internal quotation

marks and citations omitted); *see also Yue Yu v. McGrath*, 597 Fed. Appx, 62, 68 (3d Cir. 2014) (affirming the district court's decision to dismiss "all of the remaining state and common law claims after awarding summary judgment to [d]efendants on all of the federal claims over which it had original jurisdiction"). "Importantly, pendent jurisdiction is a doctrine of discretion, not a plaintiff's right." *Yue Yu*, 597 Fed. Appx. at 68.

Ivy's remaining claim is entirely grounded in state law, and considerations of judicial economy, convenience, and fairness to the parties do not provide an affirmative justification to exercise jurisdiction over that claim. Accordingly, the Court will decline to exercise supplemental jurisdiction over that claim. *Id.* at 68; *see also* 28 U.S.C. § 1367(c)(3) (permitting a district court to decline to exercise supplemental jurisdiction where it has "dismissed all claims over which it has original jurisdiction"). Consequently, Ivy's medical malpractice claim will be dismissed, without prejudice to his refiling the same in state court.

V.    Conclusion

For the reasons stated herein, Defendant's Motion for Summary Judgment is GRANTED. Judgment will be entered in favor of Defendant and against Plaintiff as to each of Plaintiff's federal claims. Those claims are dismissed, with prejudice.[10]

The Court declines to exercise supplemental jurisdiction over Ivy's state law medical malpractice claim. That claim is dismissed, without prejudice to Ivy's ability to pursue relief in state court.

---

[10] For the same reasons, Ivy cannot demonstrate a likelihood of success on the merits of his motion for preliminary injunction. *See* ECF No. 70. That motion, as well as Ivy's motion for a hearing [ECF No. 77], are dismissed as moot.

An appropriate order will follow.

RICHARD A. LANZILLO
Chief United States Magistrate Judge

Dated:  July 17, 2023